# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Michael R. Whipple, | Case No. 13-cv-2861 (JRT/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Thomas Edwards, a PsyD, LP-Psychologist 3 MSOP (St. Peter site); Gary Grimm, Assistant Program Director MSOP (St. Peter site); Robert Elsen, a Behavior Analyst (BAII) MSOP (St. Peter site); Luke Moulder, a Behavior Analyst (BAZ) MSOP (St. Peter site); James Hickey, Officer of the Day (O.D.) MSOP (St. Peter site); and Dennis Benson, former Chief Executive Officer of the Minnesota Sex Offender Program, | |
| Defendants. | |

---

HILDY BOWBEER, United States Magistrate Judge

Plaintiff Michael R. Whipple, a client of the Minnesota Sex Offender Program ("MSOP"), alleges that Defendants violated his federal and state constitutional rights by placing him in restrictive conditions for over three months without adequate procedural protections. MSOP officials also conducted an unclothed visual search (*i.e.*, strip search) of Whipple immediately prior to his placement in the restricted area, and Whipple alleges that this search—and the MSOP policy by which it was conducted—was unlawful as well. Several of the Defendants originally named by Whipple to this litigation have already been dismissed without prejudice for lack of plausible allegations regarding

1

personal involvement in unlawful behavior. (Order, July 22, 2016 [Doc. No. 14], adopting R. & R., June 22, 2016 [Doc. No. 12].) The remaining Defendants[1] now seek dismissal of this lawsuit pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. [*See* Doc. Nos. 17, 26.] For the reasons explained below, this Court recommends that all Defendants except Dennis Benson and Gary Grimm be dismissed without prejudice from the litigation. This Court further recommends that all claims against Benson and Grimm except the claim related to the strip search be dismissed without prejudice. In other words, only a single claim—that Benson and Grimm violated Whipple's constitutional rights through the creation and implementation of an unlawful policy authorizing unreasonable unclothed visual searches of MSOP clients—is recommended to go forward.

## I.  FACTUAL ALLEGATIONS

For purposes of this Report and Recommendation ("R. & R."), this Court accepts as true all non-conclusory factual allegations made in the complaint. *See Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008).

On the morning of July 31, 2009, Whipple and another MSOP client exchanged punches while in a stairwell at MSOP's St. Peter, Minnesota facility. (Compl. ¶¶ 14-15 [Doc. No. 1].) Whipple was immediately apprehended by MSOP officials, placed in handcuffs, and taken to the facility's High Security Area ("HSA"). (*Id.* ¶ 21.) Just prior to being transferred to the HSA, Whipple was both pat-searched and searched with a

---

[1]  See Section II.A below.

metal-detecting wand.  (*Id.*)  Upon arriving at the HSA, unnamed MSOP security

officials insisted that Whipple either undergo a strip search or wear handcuffs for four

hours upon his arrival, consistent (they said) with MSOP policy.[2]  (*Id.*)  Whipple chose

the strip search.  (*Id.*)

> Under MSOP policy,
>
> A patient may be place [sic] on Administrative Restriction when: (1) the
> patient is suspected of committing a crime or charged with a crime; (2) the
> patient is the subject of a criminal investigation; (3) the patient is awaiting
> sentencing following the conviction of a crime; (4) the patient is awaiting
> transfer to a correctional facility.[3]

(Devine Aff. Ex. A at 2 (punctuation altered) [Doc. No. 20-1 at 3].)  The same day as the

altercation, an Imposition of Administrative Restriction signed by defendant Luke

Moulder was placed on Whipple pending a criminal investigation of the fight.  (Compl.

¶ 26.)  While on Administrative Restriction, Whipple was permitted only thirty minutes

---

[2]  Whipple alleges that MSOP policy 301.087 establishes this requirement, but, unlike the
other policies at issue in this litigation, none of the parties submitted a copy of policy
301.087 to the Court.  The Court therefore must rely entirely on the allegations made by
Whipple in the complaint regarding the content of the search policy.  (*See* Compl. ¶ 53.)

[3]  Whipple's complaint makes repeated and direct reference to specific MSOP policies,
the lawfulness of which are at issue in this litigation.  "Though matters outside the
pleading may not be considered in deciding a Rule 12 motion to dismiss, documents
necessarily embraced by the complaint are not matters outside the pleading."
*Enervations, Inc. v. Minn. Mining and Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004)
(quotations omitted).  "[T]he Eighth Circuit has cited with approval the rule that 'a court
may consider an undisputedly authentic document that a defendant attaches as an exhibit
to a motion to dismiss if the plaintiff's claims are based on the document.'"  *Cobb v.
PayLease LLC*, 34 F. Supp. 3d 976, 979 n.2 (D. Minn. 2014) (quoting *Parnes v.
Gateway 2000, Inc.*, 122 F.3d 539, 546 n.9 (8th Cir. 1997)).  This Court has therefore
examined and relied upon the MSOP policies themselves, as submitted by defendants, in
considering the pending motions to dismiss.

outside of his room per eight-hour shift (with second- or third-shift requests subject to staff availability)[4] during which to bathe, speak with his attorney, or take care of any other personal needs.  (*Id*.)  Whipple was handcuffed at all times outside of his room until August 13, 2009, when that restriction was lifted.  (*Id*. ¶¶ 26, 28.)  Whipple was not permitted to engage in MSOP therapeutic programming while on Administrative Restriction, nor was he permitted visits from outsiders.  (*Id*. ¶ 26.)  Whipple was also denied direct access to his property, though he could place particularized requests for his belongings through MSOP staff.  (*Id*.)

Clients placed on Administrative Restriction may challenge the Restriction, or any of the specific conditions imposed as a result of the Restriction, by submitting written information rebutting the imposition or conditions, in which case the MSOP Director must provide a written response within seven days.  (Devine Aff. Ex. A at 4.)  The decision of the MSOP director is not subject to appeal.  (*Id*.)  After placement at the HSA, status reviews "must occur weekly while the patient is on Administrative Restriction."  (*Id*.)

By all indications, MSOP officials followed these policies in Whipple's case. Although the exact circumstances of the challenge are not clear, Whipple availed himself

---

[4]  The complaint is ambiguous on this point.  (*See* Compl. ¶ 27 (quoting restriction as stating "Mr. Whipple will reside in room (105B) at this time, and will be allowed only 30 minutes out time (per shift); second and third shift only at [sic] staff availability").)  Defendants describe Whipple as alleging that he could *only* attend to his personal needs during the second or third shift.  (Defs' Mem. at 5 [Doc. No. 19].)  This Court, however, reads Whipple as alleging that he would *always* receive thirty minutes outside his room during first shift and *could* also receive half-hour breaks during the second and third shift, but only if sufficient staffing was available to accommodate the request.

of MSOP's appellate review procedure at least once, but was unsuccessful in having his Administrative Restriction status lifted. (*Id.* ¶ 35.) Whipple's conditions did change somewhat for the better after Defendant Robert Elsen entered updated Administrative Restriction plans on August 10 and August 13 (*see* Compl. ¶¶ 27-28). For the most part, however, Whipple remained subject to the restrictions described above until he was transferred to MSOP's Moose Lake facility on November 9, 2009.[5] Whipple was also subject to restrictions at the new facility—restrictions that are not a subject of this litigation—on the grounds that "Mr. Whipple is currently under investigation for criminal behavior." (Compl. ¶ 31 (quoting administrative restriction plan of November 9, 2009).) But despite the lengthy amount of time he was putatively under investigation, Whipple was never charged criminally as a result of the July 31 incident.[6]

---

[5] In addition to the Administrative Restriction, Whipple was also placed on protective isolation at St. Peter between July 31 and November 9, 2009. (Compl. ¶ 25.) Unlike Administrative Restriction, which is used to isolate clients either while criminal behavior is investigated or in anticipation of a move to a correctional facility, protective isolation is used "as a way of defusing or containing dangerous behavior that is uncontrollable by any other means." (Devine Aff. Ex. B at 2 [Doc. No. 20-1 at 14].) The conditions of Whipple's protective isolation appear to have been identical to those imposed as a result of the Administrative Restriction, and both Whipple and Defendants often elide the two statuses in their submissions to the Court. (*See, e.g.*, Compl. ¶ 8.) Similarly, the Court has not distinguished between the two in this R. & R.

[6] Whipple also refers to "continued HSA restrictions" imposed by Grimm "between February and March 2010" (Compl. ¶ 33), but he does not explain how these restrictions relate to the events that are the subject of this litigation (*id.* ¶ 3). Any claims regarding Whipple's treatment in 2010—which are mentioned in only a single paragraph of the complaint, and even then in only a conclusory manner—are too poorly developed to go forward (if in fact they are being raised at all).

## II.    ANALYSIS

### A.    Procedural Status

Whipple filed this lawsuit in 2013.  Almost immediately afterward, this action was stayed pending resolution of related issues in *Karsjens v. Minnesota Department of Human Services*, No. 11-cv-3659 (DWF/TNL).  (Order, Oct. 28, 2013 [Doc. No. 3].)  The stay was lifted in April 2016.  (Order, Apr. 14, 2016 [Doc. No. 10].)

When he commenced this lawsuit, Whipple applied for *in forma pauperis* ("IFP") status.  The IFP application was pending when the stay was imposed and thus remained pending at the time the stay was lifted.  On June 22, 2016, this Court granted the IFP application and ordered that service of process be effected upon, or waiver of service sought from, Defendants Thomas Edwards, Gary Grimm, Robert Elsen, Luke Moulder, James Hickey, and Dennis Benson in both their individual and official capacities consistent with Rule 4 of the Federal Rules of Civil Procedure.  (Order, June 22, 2016 [Doc. No. 11].)  This Court also recommended, pursuant to 28 U.S.C. § 1915(e)(2)(B), that about a dozen other Defendants be dismissed without prejudice due to insufficient allegations in the complaint that those individuals had personally acted unlawfully.  (R. & R., June 22, 2016 [Doc. No. 12].)  Whipple did not object to that R. & R., which was adopted on July 22, 2016.  (Order, July 22, 2016 [Doc. No. 14].)

On September 7, 2016, each of the remaining Defendants in their *official* capacities, along with Benson in his *individual* capacity, filed a motion to dismiss the complaint.  [Doc. No. 17.]  About a month later, Elsen in his individual capacity filed a

separate motion to dismiss.  [Doc. No. 26.]  The arguments for dismissal set forth in those motions will be examined below.[7]

Before reaching those arguments, however, this Court must address the status of Edwards, Grimm, Moulder, and Hickey in their *individual* capacities.  None of those Defendants joined in the motions to dismiss—or, for that matter, made an appearance in this case—contending that service of process has not yet been properly effected upon them in their individual capacities.  (Defs.' Mem. at 1 n.1 [Doc. No. 19].)  Still, although those parties did not formally join in the motions to dismiss, the memoranda filed with those motions argue that Edwards, Grimm, Moulder, and Hickey must be dismissed from this action for lack of personal jurisdiction due to insufficient service of process.

Under 28 U.S.C. § 1915(d), "[t]he officers of the court shall issue and serve all process" where a litigant has been granted IFP status.  Consistent with that obligation, though not consistent with the precise requirements of Rule 4, the U.S. Marshal's Service sent via certified mail a copy of the summons and the complaint to each of the named Defendants.  [Doc. No. 41.]  Although the method employed by the Marshal's Service was not satisfactory under Rule 4(e) as to *any* Defendants in an individual capacity,[8] Benson, and later Elsen, consented to the method of service employed.  The other

---

[7]  This case was *again* stayed in June 2017 after briefing had been completed on the motions to dismiss and those motions had been taken under advisement.  [Doc. No. 46.] This second stay was lifted in October 2018.  [Doc. No. 47.]

[8]  This District's practices and procedures with respect to service of process in IFP cases have been substantially amended since service was attempted in this matter.

Defendants, however, have not consented to service through a method other than that permitted by Rule 4(e), and they are within their rights not to have done so.

"If a defendant is improperly served, the court lacks jurisdiction over the defendant." *Dodco, Inc. v. Am. Bonding Co.*, 7 F.3d 1387, 1388 (8th Cir. 1993). Edwards, Grimm, Moulder, and Hickey have not been properly served. Unlike Benson and Elsen, they have not consented to the Court's jurisdiction notwithstanding the improper service. Accordingly, this Court currently lacks jurisdiction over those defendants.

Nevertheless, for two reasons, the Court declines to recommend dismissal of those Defendants on that basis. First, there is no reason to believe that Edwards, Grimm, Moulder, or Hickey would not be subject to the jurisdiction of the Court if they had been properly served. Moreover, as indicated above, service of process is ultimately the responsibility of the Court where a litigant has been granted IFP status, as is the case here. *See* 28 U.S.C. § 1915(d). If all that stood between Whipple and the successful prosecution of this lawsuit were mistakes in how service of process was effected, this Court would simply order that service of process be effected again, this time consistent with Rule 4.

Second, mistakes in how service of process was effected are *not* all that stands between Whipple and the successful prosecution of this action. Many of the arguments made by Benson and Elsen in their motions to dismiss may be applied with equal force to the claims against Edwards, Grimm, Moulder, and Hickey. Moreover, the same IFP statute that provides for service of process through officers of the court also states that

8

"the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). Thus, although Edwards, Grimm, Moulder, and Hickey in their individual capacities have not joined in the motion to dismiss, the Court may nonetheless dismiss those Defendants from the action should it find that Whipple has failed to state a claim upon which relief may be granted against those Defendants.[9]

As explained below, this Court finds that Whipple has stated a single actionable claim for relief against only one of those four unserved Defendants (Grimm) in an individual capacity.[10]  Accordingly, the other claims against the unserved Defendants may be dismissed pursuant to § 1915(e)(2)(B), despite those Defendants not having joined in the motions to dismiss.  Should this action go forward against Grimm, as is recommended, service of process must be completed and jurisdiction obtained over Grimm consistent with Rule 4(e).

## B. Eleventh Amendment

Whipple brings claims against each Defendant in both his individual capacity and official capacity as an officer or employee of the State of Minnesota.  (Compl. at 1.)

---

[9]  That Edwards, Grimm, Moulder, and Hickey have not been served and thus have not been brought within the jurisdiction of the Court does not preclude dismissal under § 1915(e)(2)(B)(ii).  Indeed, dismissal under § 1915(e)(2)(B) is ordinarily effected prior to service of process, and thus before Defendants have been brought within the jurisdiction of the court.  *See, e.g.*, *Carter v. Schafer*, 273 F. App'x 581, 582 (8th Cir. 2008) (per curiam).

[10]  Another Defendant against whom the Court finds a viable claim has been pleaded, Benson, has already consented to the Court's jurisdiction.

"The Supreme Court has interpreted the Eleventh Amendment to bar actions in federal court against a state by its citizens." *Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996) (citing *Hans v. Louisiana*, 134 U.S. 1, 15 (1890)). "Additionally, the Eleventh Amendment prohibits federal-court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially 'for the recovery of money from the state.'" *Id.* (quoting *Ford Motor Co. v. Dep't of the Treasury*, 323 U.S. 459, 464 (1945)). Defendants correctly argue, and Whipple agrees, that any claims for monetary relief brought against them in their official capacities must therefore be dismissed without prejudice for lack of jurisdiction.

Defendants also argue that Whipple's claims against them in their official capacities for *non*-monetary relief—that is, injunctive relief—should likewise be dismissed, though for different reasons. As Defendants recognize, a litigant may seek prospective injunctive relief against a defendant named in his or her official capacity as an officer or employee of the State. *See Ex Parte Young*, 209 U.S. 123 (1908). Defendants also recognize that Whipple seeks injunctive relief in his complaint. Nevertheless, Defendants contend that an action for injunctive relief cannot be maintained against them in their official capacities because, in effect, that relief would not be *prospective*. According to Defendants, Whipple "does not allege an ongoing harm or a threat of a real and immediate injury" (Defs.' Reply at 4 [Doc. No. 35]), and Whipple has been transferred to a different facility, thus mooting any concerns that he would be subject to similar treatment in the future by the same Defendants.

10

This is an overly cramped reading of Whipple's complaint. The pleading contends that the policies at issue apply to *all* MSOP clients, not just those at the St. Peter facility; thus, Whipple's transfer does not render moot his requests for prospective relief from those policies. Nothing in the record suggests that those policies do not remain in effect now. Moreover, Whipple alleges that the Defendants at issue—or MSOP officials in equivalent positions today—are responsible for creating, amending, and implementing the allegedly unlawful policies. Those officials are therefore appropriate parties from whom to seek injunctive relief. *See* Fed. R. Civ. P. 25(d). Finally, any accusation of misconduct by MSOP officials in the future, whether meritorious or otherwise, could result in Whipple being subjected to the allegedly unlawful policies in the future. Consequently, Whipple's request for injunctive relief is not excessively speculative.

That said, in order to succeed on his official-capacity claims, Whipple must show that the policies at issue are, in fact, unlawful. For the most part, as set forth more fully below, Whipple has failed to do so, and thus the official-capacity claims may be dismissed on the same grounds as the individual-capacity claims. Only with respect to the strip-search claim, and only with respect to defendants Benson and Grimm, has Whipple adequately alleged a violation of his constitutional rights based on unlawful policy. Thus, it is recommended that this claim be allowed to go forward against both Benson and Grimm in both their individual and official capacities.

C.    **Rule 12(b)(6)**

1.    **Standard of Review**

Under Federal Rule of Civil Procedure 12(b)(6), a court must accept as true a complaint's factual allegations and draw all reasonable inferences in the plaintiff's favor. *Aten*, 511 F.3d at 820. Although the plaintiff's factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also "state a claim to relief that is plausible on its face." *Id*. at 570. In assessing a claim's plausibility, the Court may disregard any allegation that is conclusory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that conclusory allegations "are not entitled to the assumption of truth.").

2.    **Procedural Due Process**

Broadly speaking, Whipple's complaint raises two categories of claims. First, he alleges that he was made subject to an Administrative Restriction without sufficient procedural protections, in violation of his federal and state constitutional due-process rights. Second, Whipple alleges that the substantive conditions of confinement to which he was subjected while on Administrative Restriction violated his federal and state constitutional rights. This Court will first examine Whipple's procedural claims before turning to his conditions-of-confinement claims.

Although not presented as such, Whipple's procedural claims can be categorized further: (1) To what process was Whipple entitled before being apprehended in the immediate aftermath of the July 31 altercation? (2) To what process was Whipple

entitled before MSOP officials could impose an Administrative Restriction upon

Whipple?  (3) After those continuing restrictions were imposed, to what process was

Whipple entitled to challenge or seek changes in those restrictions?  The Court will

examine those questions in turn.

"A procedural due process claim is reviewed in two steps."  *Senty-Haugen v.*

*Goodno*, 462 F.3d 876, 886 (8th Cir. 2006).  First, the Court must examine whether

Whipple was deprived of a protected liberty or property interest.  *Id*. (citing *Dover*

*Elevator Co. v. Ark. State Univ.*, 64 F.3d 442, 445-46 (8th Cir. 1995)).  Second, if a

protected interest is at stake, the Court must "consider what process is due by balancing

the specific interest that was affected, the likelihood that the [current] procedures would

result in an erroneous deprivation, and the [governmental] interest in providing the

process that it did, including the administrative costs and burdens of providing additional

process."  *Id*. (citing *Mathews v. Eldridge*, 424 U.S. 319, 332-35 (1976)).  Because

Whipple "has been civilly committed to state custody as a dangerous person, his liberty

interests are considerably less than those held by members of free society," though as

compared to a prison inmate, he is "entitled to more considerate treatment and conditions

of confinement."  *Id*. (quotations and citations omitted).  For purposes of each of

Whipple's due-process claims, this Court assumes, without deciding, that Whipple had a

liberty interest in the less-restrictive conditions imposed outside of the HSA. *See*

*Perseke v. Moser*, No. 16-cv-0557 (PJS/LIB), 2016 WL 6275191, at *5 (D. Minn.

Sept. 26, 2016) ("Plaintiff arguably has a protected liberty interest at stake when he is

placed in the HSA, which affords him some measure of due process."); *but see Larson v. Jesson*, No. 11-cv-2247 (PAM/LIB), 2018 WL 3352926, at *5 (D. Minn. July 9, 2018).

### a.    Process Due Following Altercation

On initial review of the complaint pursuant to § 1915(e)(2)(B), this Court noted that "Whipple does not appear to contest his *initial* placement in protective isolation" (R. &. R. at 3 [Doc. No. 12]; that is, Whipple did not seem to be suggesting that MSOP officials erred in restraining him after the fight and moving him to the HSA in the immediate aftermath (*see* Compl. ¶¶ 13, 24). On that basis, this Court recommended dismissal without prejudice of all defendants who were alleged to have been involved only in that portion of events. (R. & R. at 3-5.) Whipple did not object to this Court's recommendation of dismissal, which was subsequently adopted.

In his briefing, however, Whipple occasionally seems to suggest that he *is*, in fact, contesting Defendants' actions immediately following the altercation, arguing that Defendants should have afforded him greater procedural protections before apprehending and detaining him following the fight. (*See, e.g.*, Pl.'s Mem at 12 [Doc. No. 33] ("Plaintiff was not provided with a hearing *prior to being handcuffed and taken to the HSA*." (emphasis added)).) As stated above, this Court assumes for purposes of this R. & R. that Whipple had a protected liberty interest in avoiding the greater restrictions imposed in the HSA. It does not follow, however, that Whipple was entitled to procedural protections before MSOP officials could take any action at all towards him. Whipple had just been involved in—and, so far as the complaint suggests, had *initiated*— a physical fight with another client. (Compl. ¶ 17.) MSOP officials have a constitutional

14

obligation to take reasonable measures in protection of the safety of its clients. Immediate action towards that end—specifically, the restriction and isolation of the fight participants—was reasonably deemed necessary. MSOP officials were not required to conduct a hearing prior to separating and restraining Whipple from the fellow client he had just assaulted. *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997) ("This Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause."); *Hudson v. Palmer*, 468 U.S. 517, 532-34 (1984). This aspect of Whipple's due-process claim is entirely without merit.

### b.    Process Due Before Extended HSA Placement

MSOP policy in effect at the time of the events at issue permitted officials to place additional restrictions on clients for a period of up to 24 hours (excluding weekends and holidays) in the immediate aftermath of an event endangering the safety of its clients. (Devine Aff. Ex. A.) After that 24-hour period, the patient's attorney of record must be notified of the Administrative Restriction, appropriate documentation must be submitted justifying the Administrative Restriction, and the MSOP Assistant Director or Program Manager must review the decision and determine whether the Administrative Restriction will continue or be terminated. (*Id*. at 3.) The patient and his attorney are provided written notice of the decision, and the patient may request review of the decision by the MSOP director through the submission of written information rebutting the imposition of the Administrative Restriction or any particular conditions of that Restriction. (*Id*. at 3-5.)

15

Nothing in Whipple's complaint suggests that MSOP officials acted contrary to that policy. In fact, the pleading alleges that MSOP officials acted even *more* quickly than necessary, with officials issuing the necessary reports and thereby invoking the facility's procedural machinery within the same day as the altercation. (Compl. ¶¶ 25-26.) Rather than alleging that MSOP officials acted in violation of the policy, Whipple claims that the due-process clause requires greater procedural protections than the MSOP policy allows, specifically, a hearing (rather than written appeal) in which the evidence may be presented to the client and at which the Administrative Restriction may be disputed.

"The most important mechanisms for ensuring that due process has been provided are 'notice of the factual basis' leading to a deprivation and 'a fair opportunity for rebuttal.'" *Senty-Haugen*, 462 F.3d at 888 (quoting *Wilkinson v. Austin*, 545 U.S. 209, 225-26 (2005)). The procedures employed in this matter were sufficient to accomplish both these ends. *See Perseke*, 2016 WL 6275191, at *5; *Favors v. Hoover*, No. 13-cv-0428 (JRT/LIB), 2014 WL 4954682, at *20 (D. Minn. May 13, 2014). Whipple does not explain what more a live hearing would have accomplished that a written procedure could not, and his argument that such a hearing is *constitutionally* required in circumstances such as those present here is without support. *See Goff v. Dailey*, 991 F.2d 1437, 1440-41 (8th Cir. 1993) ("Not all deprivations of interests protected by the Fourteenth Amendment require full evidentiary hearings before impartial decision-makers using a preponderance of the evidence or higher standard."); *Larson*, 2018

16

WL 3352926, at *4.  Whipple has not adequately alleged that he was afforded insufficient

process before being placed in Administrative Restriction.

### c.    Process Due During HSA Placement

Whipple also contends that MSOP officials provided insufficient procedural

protections *during* his placement in the HSA, that is, they did not afford him an

appropriate means by which to challenge his continuing restrictions.  Under MSOP

policy, where an Administrative Restriction is implemented due to an ongoing criminal

investigation, that restriction must be immediately terminated when the investigation is

complete (if the patient is not charged with a crime).  (Devine Aff. Ex. A at 6).  Barring

that, the Administrative Restriction may be terminated at any time at the discretion of the

MSOP Assistant Director or Program Manager.  (*Id.*)  The patient's status is subject to

ongoing weekly review while the patient remains on Administrative Restriction, and

reviews may occur more frequently "if there are changes in the patient's behavior or if

staff recommends modification to the Administrative Restriction Plan."  (*Id.* at 5.)

Nothing suggests that Whipple cannot supply information or argument to the relevant

decisionmakers to be used in making adjustments in status.

As with the claim regarding the imposition of the Administrative Restriction,

Whipple does not adequately allege that MSOP officials deviated from the relevant

policy.  Nothing in the complaint indicates that the required weekly reviews did not take

place; indeed, Whipple's restrictions were altered by MSOP officials during his

detention.  (Compl. ¶¶ 27-28.)  At bottom, Whipple "does not allege that he was deprived

of the opportunity to be heard; he is instead arguing only that he is displeased with the

17

decisions of those who heard him." *Perseke*, 2016 WL 6275191, at *5. But this, of course, does not amount to a due process violation. Accordingly, this final aspect of Whipple's procedural-due-process claim should also be denied like the others.

### 3. Fourth Amendment

Whipple advances two claims under the Fourth Amendment. First, Whipple contends that the strip search conducted by MSOP officials upon his arrival at the HSA was unreasonable under the circumstances and that, to the extent that MSOP policy required such a search, the policy violates his constitutional rights. Second, Whipple contends that the conditions of his confinement whine in the HSA amounted to an ongoing violation of his right against unreasonable seizures. This Court will consider those claims in turn.

### a. Strip Search

After transferring Whipple to the HSA, unnamed MSOP officials conducted a strip search. Whipple contends that this search was unreasonable under the circumstances because he had already been pat-searched and passed over with a metal-detecting wand prior to the unclothed visual search. He seeks monetary relief for this claim.

"[I]nvoluntarily civilly committed persons retain the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1028 (8th Cir. 2012). This standard is similar, if not identical, to that applied in the prison context, as comparable institutional and safety concerns apply in each venue. *Id*. at 1028-29.

18

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559 (1979). "[S]trip searches conducted at MSOP facilities may or may not be reasonable, and thus may or may not be constitutional, depending on the circumstances." *See Allan v. Ludeman*, Civ. No. 10-176, 2011 WL 978768, at *4 (D. Minn. Jan. 18, 2011). Evaluating the legality of any given search requires a fact-dependent inquiry. *See Karsjens v. Piper*, 336 F. Supp. 3d 974, 995 (D. Minn. 2018).

Before discussing the legality of the strip search, however, this Court must note a critical pleading deficiency: Whipple does not allege *who* performed the allegedly unlawful strip search. (*See, e.g.*, Compl. ¶ 21.) "Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990). This Court must have reason to believe from the pleading that a particular Defendant was in some way involved in the actions being contested before claims relating to those actions may proceed against that Defendant.

Whipple's Complaint meets that requirement with respect to only two of the named Defendants. Although not involved in the actual search, Benson and Grimm—as Chief Executive Officer of the MSOP program and Assistant Program Director, respectively—may fairly be imputed with responsibility for policies regarding the use of strip searches at MSOP, pursuant to which the officers who actually performed the search were acting. (*See* Compl. ¶¶ 53, 57.) "In an action under § 1983, a . . . supervisor cannot

be liable on a respondeat superior theory, but can be held liable if a constitutional violation resulted from a . . . policy or custom." *A.H. v. St. Louis Cty.*, 891 F.3d 721, 728 (8th Cir. 2018). If Benson and Grimm were responsible for creating or implementing an unlawful policy (as is alleged in the complaint), then they may be held personally liable for their furtherance of that unlawful policy. Further, to the extent that Benson, Grimm, or someone in their positions today can amend the allegedly unlawful policy, a plaintiff could seek prospective injunctive relief from those Defendants in their official capacities.[11]

The defenses offered by Benson and Grimm to this claim are not well-developed. For example, Benson contends in his briefing that "Plaintiff has not alleged that Benson was involved in his unclothed body search . . . ." (Defs.' Mem. at 22.) This is correct insofar as Whipple does not allege that Benson *personally* performed the search at issue. But Whipple does plausibly allege that Benson (and Grimm) "created and implemented"

---

[11] Defendants argue that Whipple's official-capacity claims against Benson must fail because, by the time this lawsuit was brought, he was no longer Chief Executive Officer of MSOP and thus had no authority to change policy. Under Fed. R. Civ. P. 25(d), "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." To be sure, Benson did not "cease[] to hold office while the action was pending"—he had stepped down prior to the filing of the lawsuit—but Whipple's intention in seeking injunctive relief from the individual now capable of effecting that relief was clear from the pleading, and the Court regularly substitutes official-capacity defendants under Rule 25(d) where the officeholder changes just prior to litigation. Moreover, even if Rule 25(d) did not apply, if all that stood athwart Whipple's attempt to seek injunctive relief were the naming of the correct official-capacity defendant, this Court would freely grant leave to amend the complaint and add the correct name to the caption.

the search policy at issue. (Compl. ¶ 57.) The Court has no reason to think that this allegation is implausible. And, as explained above, creation or implementation of an unlawful policy or custom is itself grounds for liability under § 1983.

Benson also suggests that the allegations against him are insufficient to put him on notice of the exact claim against him: "[Whipple] further refers to MSOP Policy 301.087, indicating that it provides how unclothed visual body searches will be conducted, but again without identifying that policy by name, or its period of applicability." (*See* Defs.' Mem. at 11.) It is not clear what more information Benson is looking for; Whipple cites to the specific MSOP policy he intends to put at issue, and a reader can reasonably infer from the complaint that the relevant "period of applicability" for the policy is from the time of the events at issue through today. (*See* Compl. ¶ 53.) That is sufficient.

Not until Benson's reply brief does he address head-on Whipple's allegations by arguing that the Fourth Amendment claim fails on its merits.[12] (*See* Defs.' Reply at 12-13.) Even then, however, Benson does no more than cite to cases in which courts have concluded that unclothed visual searches are or may be reasonable in *other* contexts at MSOP. *See Beaulieu*, 690 F.3d at 1027-28 (approving policy authorizing strip searches "before and after transport, after contact visits upon suspicion and with the facility director's approval, or if reasonable suspicion exists to believe that a patient has

---

[12] As a general rule, courts do not consider arguments first put forward in reply briefs, as it deprives the opposing litigant of the opportunity to respond to those arguments. That said, Whipple filed a sur-reply in this matter [Doc. No. 39], despite lack of permission to do so, and thus Whipple has not been deprived of the opportunity to respond to Benson's arguments.

committed a crime or possesses contraband.");[13] *Serna v. Goodno*, 567 F.3d 944, 955-56 (8th Cir. 2009) (describing as "outer limit" of constitutionality facility-wide bodily searches for specific contraband known by officers to be present at facility); *Senty-Haugen v. Goodno*, No. 04-cv-1077 (ADM/JJG), 2015 WL 2917464, at *8 (D. Minn. Nov. 4, 2005) (finding strip search upon arrival at new facility "reasonably related to the safety of MSOP staff and patients, particularly given Plaintiff's recent threats to MSOP staff."). Moreover, each of these findings was made only *after* a fact-intensive inquiry into why an unclothed visual search is reasonable in those circumstances. No such inquiry has yet been conducted here, and Rule 12 review is generally not the appropriate stage in which to conduct such an inquiry. *See Yazzie v. Moser*, No. 12-cv-0399 (PAM/JJK), 2014 WL 3687110, at *3-4 (D. Minn. July 24, 2014) (denying motion to dismiss similar Fourth Amendment claim brought by MSOP client).

Nor is the question here so obvious that the claim may be disposed of on the pleadings. Under the facts of this case, assuming the allegations in the complaint to be true, Whipple had already been subjected to two separate searches—once through a pat-down, and again through a metal-detecting device—before being brought to HSA. There was no specific reason—none proffered by defendants, anyway—why Whipple might have been expected to possess contraband at the time the unclothed search was conducted. Further, although the complaint is not clear on this point, there is a

---

[13] This Court does not read *Beaulieu* as suggesting that strip searches may be authorized upon suspicion that *any* crime has been committed, but only where such a search may plausibly reveal the existence of evidence related to that crime.

suggestion that the other participant in the complaint, who was similarly restrained following the fight, did *not* undergo a full unclothed search despite also being transferred to the HSA. (Compl. ¶¶ 17, 19 (noting that the other client was required to remove his socks and shoes with no reference to full bodily search).) This difference may reflect appropriate discretion on the part of MSOP officials, but it also suggests that a policy that requires *all* clients moved to the HSA to be strip-searched may be overbroad.

This is not to say that the MSOP policy at issue of automatic unclothed searches upon entering HSA is necessarily *unreasonable*; this Court can certainly imagine rationales for the policy.[14] But Defendants have not put forward such a rationale, and it is not the Court's province to speculate on their behalf. Accordingly, Whipple's challenge to the strip-search policy should be permitted to go forward.

Two loose ends remain to be tied with respect to Whipple's strip-search claim. First, Benson—though not Grimm, who, as explained above, has not yet been served in this matter—broadly asserts that he is entitled to qualified immunity in these proceedings insofar as he is sued in his individual capacity for monetary damages. (Defs.' Mem. at 28-30.) Benson "is entitled to qualified immunity unless his 'conduct violated a clearly established constitutional or statutory right of which a reasonable officer would have known.'" *Moore-Jones v. Quick*, 909 F.3d 983, 985 (8th Cir. 2018) (quoting *Cravener v. Shuster*, 885 F.3d 1135, 1138 (8th Cir. 2018)).

---

[14] And again, this Court must rely upon Whipple's allegations regarding the policy, as the policy itself has not been submitted to the Court.

23

This Court finds that discussion of the qualified-immunity defense is premature. For one thing, the defense is almost entirely undeveloped in the briefing.  Benson makes no effort to describe the state of the law at the time of the events at issue or explain why a reasonable officer would not have known that the policy at issue might violate the law. Indeed, read literally, Benson has not even asserted his qualified-immunity defense with respect to the strip-search claim, but only regarding "the decision regarding Plaintiff's continued placement in HSA in Protective Isolation and with the restrictions that were imposed."  (Defs.' Mem. at 29; Defs.' Reply at 14.)  Grimm has not raised the defense at all, since—as defendants repeatedly stress throughout their briefing—he has not yet appeared before the Court in his individual capacity.  And it would be foolish to examine whether a specific MSOP policy clearly violates the law (and thus whether Benson or Grimm acted unlawfully in promulgating, amending, or implementing the policy) without that policy itself having even been put into the record before the Court.  Accordingly, this Court finds that the more prudent course is to allow Benson to reassert his qualified-immunity defense at a later date, when both the factual and legal record may be further developed.[15]  Grimm, of course, may assert a qualified-immunity defense at that time as well.

Second, due to the unusual procedural development of this case, it is unclear whether, or to what extent, Whipple's requests for prospective injunctive relief have

---

[15] Even if qualified immunity were granted to Defendants in their individual capacities, this defense would not apply to any surviving official-capacity claims. *See Grantham v. Trickey*, 21 F.3d 289, 295-96 (8th Cir. 1994).

become moot.  Whipple's 2013 complaint relates to a policy in place at MSOP in 2009.  The final brief on Defendants' motions to dismiss was submitted in November 2016.  This Court presently has no way of knowing in what ways MSOP's policies and practices have changed in the meantime.  Further development of this question, too, must wait until a later date.

In sum, due to the lack of personal allegations against Edwards, Elsen, Moulder, and Hickey regarding the July 31, 2009, strip search and implementation of the associated strip-search policy, it is recommended that Whipple's claim against those defendants be dismissed without prejudice.  By contrast, Whipple has adequately alleged that Benson and Grimm were responsible for creation and implementation of the policy claimed by him to be unlawful.  That policy is not so obviously reasonable that Whipple's claim should be dismissed on Rule 12(b)(6) review.  Accordingly, it is further recommended that the claim be permitted to go forward against Benson and Grimm in both their individual and official capacities.

### b.    Confinement

Whipple also seeks relief under the Fourth Amendment based on his ongoing seizure while in the HSA.  The scope of this claim is not entirely clear.  In some ways, this claim is simply an analogue of Whipple's procedural-due-process claim:  MSOP officials, Whipple argues, did not provide an adequate procedural vehicle for contesting the HSA placement or resulting conditions, and thus the HSA placement constituted an unreasonable seizure.  In other ways, Whipple's Fourth Amendment claim seems to mirror his substantive-due-process claim, which is discussed more fully below:

25

Regardless of the procedures made available to him, he argues, the conditions placed upon him were so unreasonable that they must be taken as unlawful.

In the end, this aspect of Whipple's Fourth Amendment claim fails for the same reasons his due-process claims fail. As explained at length above, Whipple was afforded sufficient procedural protections during his stay at the HSA. Implicit in that finding is that the procedural protections afforded to Whipple were sufficient *in reference to* the conditions to which he was subsequently subjected. Put another way, the procedures employed by MSOP officials were reasonable in light of the subsequent conditions of confinement to which Whipple was subjected. And the same finding results in reverse: The "seizure" effected by MSOP officials was reasonable in light of the procedures that those officials employed in effecting that seizure.

Further, as explained below with respect to the substantive-due-process claim, the conditions in which Whipple was held were not so plainly egregious or shocking to the conscience that no level of procedural protection could be adequate. Accordingly, the "seizure" aspect of Whipple's Fourth Amendment claim fails alongside his due-process claims.

### 4.    Right to Counsel

Whipple next claims that the conditions imposed by the Administrative Restriction amounted to a constructive denial of his right to counsel in violation of the Sixth Amendment. (Compl. ¶¶ 77-81.) "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Whipple was never charged with a violation of a criminal offense resulting from the July 31 fight.

Moreover, neither the federal constitution nor MSOP policy entitled Whipple to representation by counsel before an Administrative Restriction, which is a non-criminal sanction, could be imposed.  Whipple's right-to-counsel claim is simply a non-starter. *See Sorenson v. Minn. Dep't of Human Servs.*, No. 14-cv-4193 (ADM/LIB), 2015 WL 251720, at *17 (D. Minn. Jan. 20, 2015).

Although pleaded as a claim respecting the Sixth Amendment right to counsel, Whipple's claim might be characterized as one respecting denial of access to the courts in violation of the First Amendment (and Whipple does, at times, suggest that the "right to counsel" he is asserting arises under the First Amendment).  Even if Whipple was not entitled to counsel during the administrative proceedings, he (like anyone else) must be afforded reasonable access to legal redress, including the opportunity to consult with an attorney.  But this claim, too, is inadequately pleaded.  "'To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'"[16]  *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (quoting *White v. Kautzky*, 494 F.3d 677, 680 (8th Cir. 2007)).  Whipple has pointed to no such "nonfrivolous and arguably meritorious underlying legal claim" impeded by the conditions imposed upon him.  *Id.*  Moreover,

---

[16]  Whipple was not a "prisoner" at the time of the events at issue, but rather was a civil detainee.  The legal standard for non-prisoner detainees, as relevant here, is the same. *See Beaulieu*, 690 F.3d at 1046-47.

Whipple himself acknowledges that he *had* access to an attorney throughout the period that the Administrative Restriction applied (up to thirty minutes each day), albeit not as much time as he would have liked.[17]  (Compl. ¶ 26.)  However characterized, Whipple's claim regarding lack of access to an attorney fails as a matter of law.

### 5.    Freedom of Association

During his time in Administrative Restriction, Whipple was prohibited from participating in MSOP programming and from seeing outside visitors.  Although he does not list the claim among the formal counts in the complaint, Whipple does suggest in his pleading that these restrictions amounted to a violation of his First Amendment right to freedom of association.  (*See, e.g.*, Compl. ¶¶ 34, 42, 45.)  The claim is not well-developed; Whipple mentions it only once in his briefing, and even then only in passing. (Pl.'s Mem. at 9 ("Plaintiff has stated an actionable 1983 claim based on his First Amendment right to freedom of association . . . .") [Doc. No. 33].)

In the prison context, "officials may violate the Constitution by permanently or arbitrarily denying an inmate visits with family members in disregard of the factors described in *Turner* and *Overton*."  *Easterling v. Thurmer*, 880 F.3d 319, 323 (7th Cir. 2018) (citing *Turner v. Safley*, 482 U.S. 78, 95-96 (1987); *Overton v. Bazzetta*, 539 U.S. 126, 131-32 (2003)).  In *Turner*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is

---

[17]  Whipple does allege in his briefing that "Plaintiff was not permitted to call his attorney, even if he specifically asked to make such a call" (Pl.'s Mem. at 25 [Doc. No. 33]), but no such allegation appears in the complaint, and Whipple has not requested to amend his complaint to add such an allegation.

reasonably related to legitimate penological interests."  482 U.S. at 89.  Whipple is not a prisoner, and thus MSOP has no legitimate *penological* interest in impinging any of Whipple's constitutional rights.  But this District has long applied a modified version of the *Turner* standard in the context of civil detainees such as MSOP clients who are held for therapeutic reasons.  *See, e.g.*, *Ivey v. Mooney*, No. 05-cv-2666 (JRT/FLN), 2008 WL 4527792, at *10 (D. Minn. Sept. 30, 2008).  Under this modified *Turner* approach, a regulation is valid if it is "reasonably related to legitimate therapeutic or institutional interests."  *Id.*

The additional restrictions imposed on Whipple following the fight, on their face, were neither permanent nor arbitrary.  Whipple contests only a 100-day period between July and November 2009 when he was subject to the additional conditions mandated following the imposition of the Administrative Restriction.  Whipple's status thereafter is unclear, but there is no reason evident from the pleading or any of the other materials submitted in this matter that the restrictions from visits or denial of access to programming became permanent features of Whipple's status at MSOP.  Moreover, under the policy at issue, Whipple was to receive weekly review of his status by MSOP officials; neither Whipple nor any of the materials he has submitted plausibly suggest that these weekly reviews did not take place.

Finally, the institutional rationale behind the restriction is obvious.  Whipple had just recently been involved in a physical fight with another client.  A psychological report, quoted at length in Whipple's own pleading, noted that "Mr. Whipple demonstrated little accountability for his actions, suggesting he was 'fed up' with his

peer's behavior and implied his actions were justified." (Compl. ¶ 30.) The imposition of additional limitations both to investigate the altercation and to protect other clients from danger posed by Whipple cannot reasonably be described as "arbitrary."

### 6.    Substantive Due Process

Whipple also challenges the conditions in which he was held following the placement of the Administrative Restriction. "To establish a violation of substantive due process rights by an executive official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the contemporary conscience." *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007) (quotation omitted).

> To reach th[e] second element, [the Eighth Circuit has] explained that the alleged substantive due process violations must involve conduct "so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."

*Truong v. Hassan*, 829 F.3d 627, 631 (8th Cir. 2016) (quoting *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002)). "'Only the most severe violations of individual rights that result from the brutal and inhumane abuse of official power rise to' the conscience-shocking level." *Davis v. White*, 794 F.3d 1008, 1015 (8th Cir. 2015) (quoting *White v. Smith*, 696 F.3d 740, 757-58 (8th Cir. 2012)).

This Court has already concluded that, except with respect to the creation and implementation of the strip-search policy, Whipple has not adequately pleaded that MSOP officials violated any constitutional right through their conduct in this matter.

30

Even if that conclusion is mistaken, nothing alleged by Whipple about his conditions of confinement while at the HSA can be said to be conscience-shocking.[18]  Throughout the period on Administrative Restriction, Whipple was given appropriate food and medical care, received daily personal time outside of his cell, and had access to his property (albeit through requests to facility staff).  MSOP officials regularly reviewed and, in some cases, adjusted Whipple's conditions.  (*See, e.g.*, Compl. ¶¶ 26-27.)  None of this is "shocking to the contemporary conscience."  *Flowers*, 478 F.3d at 873.  Whipple's substantive-due-process claim should therefore also be dismissed.

### 7. Claims Under the Minnesota Constitution

Finally, Whipple seeks to bring causes of action directly under the Minnesota constitution based on the allegations described above.  "Minnesota has not enacted a statute similar to 42 U.S.C. § 1983, which allows civil lawsuits for violations of the U.S. Constitution, and no Minnesota court has recognized a private cause of action for violations of the Minnesota Constitution."  *Eggenberger v. West Albany Township*, 90

---

[18]  This includes the allegations regarding the creation and implementation of the strip-search policy. This Court is not yet prepared to say, on the record before it, that the policy as applied to Whipple is consistent with the federal constitution, and thus recommends that claim be allowed to proceed).  Nevertheless, the alleged policy, even if unlawful, does not rise (or sink) to the level of "so inspired by malice or sadism rather than a merely careless or unwise excess of zeal . . . ."  *Truong*, 829 F.3d at 631 (quotation omitted).  In any event, Whipple's substantive-due-process claim appears entirely derivative of his Fourth Amendment claim insofar as the allegedly unlawful strip search is concerned.  If the search policy is unlawful under the Fourth Amendment, Whipple will be entitled to monetary recovery, injunctive relief, or both.  If the search policy is not unlawful under the Fourth Amendment, it is hard to imagine that the policy could be described as "literally shocking to the conscience."  *Id*. (quotation omitted).

F. Supp. 3d 860, 863 (D. Minn. 2015). The state-law constitutional claims are not viable and should be dismissed.

## III.    CONCLUSION

Whipple has pleaded a single viable claim for relief against two Defendants, Benson and Grimm, in both their individual and official capacities: that the strip search of him and the policy under which it was conducted violated his Fourth Amendment rights. It is recommended that this claim go forward. Whipple's other claims are inadequately pleaded, and his requests for monetary relief from the official-capacity defendants are barred by the Eleventh Amendment. Accordingly, it is recommended that the remainder of the complaint be dismissed without prejudice.[19]


Accordingly, based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    The Motion to Dismiss by Defendants Dennis Benson, Thomas Edwards, Robert Elsen, Gary Grimm, James Hickey, Luke Moulder in their official capacities, and Dennis Benson in his individual capacity [Doc. No. 17], be **GRANTED IN PART** and **DENIED IN PART**, as follows:

---

[19] The claims barred on jurisdictional grounds *must* be dismissed without prejudice. Because many of Whipple's remaining claims are at least fathomably amenable to repleading, it is recommended that these claims be dismissed without prejudice as well. That said, should Whipple attempt to reintroduce through a motion to amend his complaint any of the claims being dismissed, he must be prepared to demonstrate that the proposed amendments would not be futile.

a.   All claims against Edwards, Elsen, Hickey, and Moulder in their official capacities be **DISMISSED WITHOUT PREJUDICE**.

b.   The motion be **DENIED** with respect to the strip-search claim under the Fourth Amendment brought against Benson and Grimm in their individual and official capacities, and **GRANTED** in all other respects, and dismissal of the other claims against Benson and Grimm be **WITHOUT PREJUDICE**.

2   The Motion to Dismiss by Defendant Robert Elsen in his individual capacity [Doc. No. 26] be **GRANTED**, and all claims against Elsen be **DISMISSED WITHOUT PREJUDICE**.

3.   Any remaining claims against Edwards, Hickey, Moulder, and Grimm in their individual capacities be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

4.   Service of process be effected upon Grimm in his individual capacity, and that Defendants be ordered to provide information regarding where the complaint and summons may be served.

Dated: January 14, 2019            _s/ Hildy Bowbeer_____
                                   Hildy Bowbeer
                                   United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve

specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).